Kirby ARBAUGH *v.* AG PROCESSING, INC.
and Specialty Risk Services

04-682                                                       202 S.W.3d 519

Supreme Court of Arkansas
Opinion delivered February 3, 2005

*Frederick S. Spencer*, for appellant.

*Anderson, Murphy & Hopkins, LLP*, by: *Randy P. Murphy* and *Jason J. Campbell*, for appellee.

A NNABELLE CLINTON IMBER, Justice. On June 2, 2000, Appellant Kirby Arbaugh, an employee of AG Processing, Inc., was shocked with 440 volts of electricity when he attempted to turn on the electrical switch to a feed-bag line. Appellees AG Processing, Inc. and Specialty Risk Services accepted the June 2

incident as compensable and paid related medical benefits. Arbaugh claimed that he sustained a compensable organic-brain injury,[1] or in the alternative, a compensable psychological injury. Appellees controverted these claims and asserted that Arbaugh's problems were psychological and preexisted the injury. Furthermore, they contended that his problems were not causally related to the June 2 compensable injury.

A hearing was conducted on March 20, 2002, before the administrative law judge (ALJ). In an opinion and order dated June 18, 2002, the ALJ determined that Arbaugh failed to prove by a preponderance of the evidence that his cognitive dysfunction and psychological problems were causally related to the June 2 incident; that Arbaugh failed to prove that his cognitive dysfunction and psychological problems arose out of and in the course of his employment; that Arbaugh failed to establish by a preponderance of the evidence the elements necessary to prove a compensable organic-brain injury; and that Arbaugh failed to establish by a preponderance of the evidence the elements necessary to prove a compensable psychological injury.

The Arkansas Workers' Compensation Commission ("Commission") affirmed and adopted the ALJ's opinion, and Arbaugh then appealed to the Arkansas Court of Appeals. The Court of Appeals affirmed the Commission, holding that there was substantial evidence to support the Commission's finding that Arbaugh's problems were not causally related to the June 2 incident. Three dissenting judges would have reversed and remanded and instructed the Commission to enter an award of benefits for Arbaugh's organic-brain injury. *Arbaugh v. A G Processing, Inc.*, 86 Ark. App. 303, 184 S.W.3d 53 (2004). We granted a petition for review pursuant to Rule 1-2(e) of the Arkansas Rules of the Supreme Court. Accordingly, we consider the case as though it had been originally filed in this court. *Pifer v. Single Source Transp*, 347 Ark. 851, 69 S.W.3d 1 (2002).

On appeal, this court views the evidence and all reasonable inferences therefrom in the light most favorable to the Commission's decision and affirm that decision when it is supported by substantial evidence. *Gansky v. Hi-Tech Engineering*, 325

---

[1] Arbaugh alleged that the injury resulted in seizure-like symptoms, cognitive dysfunction, depression, and anxiety.

Ark. 163, 924 S.W.2d 790 (1996)(citing *Kuhn v. Majestic Hotel*, 324 Ark. 21, 918 S.W.2d 158 (1996), and *Plante v. Tyson Foods, Inc.*, 319 Ark. 126, 890 S.W.2d 253 (1994)). It is for the Commission to determine where the preponderance of the evidence lies; upon appellate review, we consider the evidence in the light most favorable to the Commission's decision and uphold that decision if it is supported by substantial evidence. *Georgia Pacific Corp. v. Ray*, 273 Ark. 343, 619 S.W.2d 648 (1981). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Williams v. Prostaff Temporaries*, 336 Ark. 510, 988 S.W.2d 1 (1999). There may be substantial evidence to support the Commission's decision even though we might have reached a different conclusion if we had sat as the trier of fact or heard the case *de novo*. *Freeman v. Con-Agra Frozen Foods*, 344 Ark. 296, 40 S.W.3d 760 (2001). It is exclusively within the province of the Commission to determine the credibility and the weight to be accorded to each witness's testimony. *Wade v. Mr. C. Cavenaugh's*, 298 Ark. 363, 768 S.W.2d 521 (1989). We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Freeman v. Con-Agra Frozen Foods, supra*; *White v. Georgia-Pacific Corp.*, 339 Ark. 474, 6 S.W.3d 98 (1999).

In addressing Arbaugh's claims below that he suffered from both a psychological injury and an organic-brain injury, the ALJ noted that claims for mental injury or illness are governed by Ark. Code Ann. § 11-9-113(a) & (b) (Repl. 2002); whereas, organic-brain injury claims are treated as ordinary accidental-injury claims and governed by Ark. Code Ann. 11-9-102(4)(A)(i) (Repl. 2002). Section 11-9-113(a) sets forth the requirements for proving compensability of a "mental injury or illness":

> (a)(1) A mental injury or illness is not a compensable injury unless it is caused by physical injury to the employee's body, and shall not be considered an injury arising out of and in the course of employment or compensable unless it is demonstrated by a preponderance of the evidence; provided, however, that this physical injury limitation shall not apply to any victim of a crime of violence.

> (2) No mental injury or illness under this section shall be compensable unless it is also diagnosed by a licensed psychiatrist or psycholo-

gist and unless the diagnosis of the condition meets the criteria established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders.

Ark. Code Ann. § 11-9-113(a)(1)(2). Under section 11-9-113(b)(1), the employee may only recover twenty-six (26) weeks of disability benefits for a claim based on a mental injury or illness. In the case of an accidental-injury claim, section 11-9-102(4)(A)(i) defines a "compensable injury" as

> [a]n accidental injury causing internal or external physical harm to the body or accidental injury to prosthetic appliances, including eyeglasses, contact lenses, or hearing aids, arising out of and in the course of employment and which requires medical services or results in disability or death. An injury is "accidental" only if it is caused by a specific incident and is identifiable by time and place of occurrence.

Ark. Code Ann. § 11-9-102(4)(A)(i). With regard to Arbaugh's organic-brain injury claim, the ALJ concluded that the following requirements must be satisfied to establish such an injury:

> (1)  proof by a preponderance of the evidence of an injury arising out of and in the course of employment (see, Ark. Code Ann. § 11-9-102(4)(A)(i) (Cumm. Supp. 1997); Ark. Code Ann. § 11-9-102(4)(E)(i) (Cumm. Supp. 1997); see also, Ark. Code Ann. § 11-9-401(a)(1) (Cumm. Supp. 1997));

> (2)  proof by a preponderance of the evidence that the injury caused internal or external physical harm to the body which required medical services or resulted in disability or death (see Ark. Code Ann. § 11-9-102(4)(A)(i) (Cumm. Supp. 1997));

> (3)  medical evidence supported by objective findings, as defined in Ark. Code Ann. § 11-9-102(16), establishing injury (see, Ark. Code Ann. § 11-9-102(4)(D) (Cumm. Supp. 1997));

> (4)  proof by a preponderance of the evidence that the injury was caused by a specific incident and is identifiable by time and place of occurrence (see, Ark. Code Ann. § 11-9-102(4)(A)(i) (Cumm. Supp. 1997)).

As summarized earlier, the ALJ found, and the Commission affirmed and adopted, that Arbaugh failed to prove by a preponderance of the evidence that his cognitive dysfunction and psy-

chological problems were causally related to the June 2, 2000 incident or that they arose out of and in the course of his employment. The ALJ further found that Arbaugh failed to establish by a preponderance of the evidence that he had sustained a compensable organic-brain injury or a compensable psychological injury.

For his sole point on appeal, Arbaugh argues that no substantial evidence supports the Commission's finding that his organic-brain problems were not a result of the electrical shock he received at work on June 2, 2000.[2] To reiterate, in determining the sufficiency of the evidence to sustain the findings of the Commission, we must view the evidence in the light most favorable to the Commission's decision and its decision must be upheld if it is supported by substantial evidence. *Deffenbaugh Indus. v. Angus*, 313 Ark. 100, 852 S.W.2d 804 (1993). In making our review, we recognize that the Commission, and not this court, determines where the preponderance of the evidence lies. *Georgia Pacific Corp. v. Ray, supra.*

The medical evidence supporting the Commission's findings on the organic-brain- injury issue may be summarized as follows. Dr. John Towbin, a seizure-disorder specialist, testified that Arbaugh was referred to him because he was having "seizure-like events." According to Dr. Towbin, the occurrence of a seizure involves abnormal activity in the cortex and creates a wave form on an EEG called a spike that is usually followed by a slow wave. Dr. Towbin proceeded to conduct video EEG monitoring of Arbaugh over two 24-hour contiguous periods of time during which Arbaugh experienced three seizure-like episodes. Throughout each episode, the EEG remained essentially unchanged. Dr. Towbin interpreted these test results to mean that the "seizure-like events" were non-epileptic and non-physiologic, but rather psychiatric in origin; that is, they were emotionally derived events and not events derived from brain pathology.[3]

---

[2] Although Arbaugh contended before the ALJ that he suffered both a psychological injury and an organic-brain injury as a result of the electrical shock, he appears to have abandoned the psychological-injury argument on appeal.

[3] As to the etiology of the psychiatric events experienced by Arbaugh, Dr. Towbin stated that not being a psychiatrist, he did not know whether to ascribe them to traumatic factors or to other life experiences.

Dr. Towbin's findings based on the EEG test data were consistent with his opinion that Arbaugh's symptoms during the "seizure-like events" were atypical of seizures. Arbaugh described the episodes as beginning with a sudden feeling of fatigue followed by a numbness on the left side of his face and then a "pin and needles" feeling that would spread across his face and eventually down his entire left side. As explained by Dr. Towbin, fatigue would be common after a seizure, not at the beginning, and seizures usually cause some positive symptoms, such as movement, rather than negative symptoms, such as loss of function.

Furthermore, Dr. Towbin stated that while it was possible to have a seizure disorder as a result of electrical injury, he opined that it would be hard to have such an injury that is substantial enough to result in cortical injury so as to cause seizures without that electrical injury doing other physical damage, such as burns in the skin, spinal cord sequelae, cardiac sequelae, or other brain-related phenomena. In that regard, Arbaugh testified during the hearing that he had bruises on his back from when he fell after the accident and red lines on the back of his head. However, during his deposition, he denied that he had any bruises or scratches after the accident. Likewise, in giving a history to Dr. Michael Morse on August 17, 2000, he reported no burns at the entry or exit site.

Dr. Gary Souheaver, a clinical neuropsychologist, evaluated Arbaugh's medical records and data collected from 1997 forward. He noted that before the June 2, 2000 incident Arbaugh suffered from several major psychiatric disorders, including suicidal attempts, a diagnosis of bipolar disorder, and major depression disorder recurrent. He further noted a history of alcohol and methamphetamine abuse. The symptoms associated with these conditions included difficulties with concentration and memory, not being able to think clearly, and bizarre thinking. In addition, the records reflected two prior closed-head injuries, one which involved the loss of consciousness. Dr. Souheaver stated that such injuries produce symptoms of personality disorganization, memory complaints, concentration difficulties, ease of fatigueability, balance issues, and sometimes ringing in the ears. Based on his review of the medical records, Dr. Souheaver concluded that Arbaugh's major diagnosis, both before and after the accident, was a differential between a bipolar disorder or a major depressive

disorder recurrent.[4] He saw no reason to resort to an organic-brain-disorder diagnosis because Arbaugh's symptoms could not be attributed to an underlying brain disorder. Specifically, Dr. Souheaver noted an "out of pattern relationship for an underlying brain disorder" from the results of a battery of psychological tests conducted by other physicians, including Dr. Betty Back-Morse, after the June 2 incident. In his words, "to get a category score . . . as good as his score is just almost unheard of in a brain disorder." Moreover, according to Dr. Souheaver, there are a number of reasons, such as depression or drugs, that a person can experience cognitive dysfunction without having a brain disorder.

Dr. Bettye Back-Morse, also a neuropsychologist, personally evaluated Arbaugh. While her testimony was favorable to Arbaugh's claim, her analysis elicited criticism from Dr. Souheaver on grounds that she relied too much on history and what Arbaugh told her rather than objective data. In fact, Dr. Back-Morse acknowledged that she did not know whether Arbaugh had cognitive dysfunction problems before the incident on June 2, 2000. Dr. Vann Smith, another neuropsychologist, also evaluated Arbaugh and presented favorable testimony that Arbaugh suffered from moderate to severe impairment after the accident. Yet, he admitted that he did not know whether or not Arbaugh fell within the moderate to severe impairment range before the reported June 2 injury. Finally, Dr. Michael Morse, a neurologist, evaluated Arbaugh six times for his "spells" and neuropathy, a nerve injury in his arms. Dr. Morse was not able to say exactly what the spells were. In his opinion, the EEG and MRI of Arbaugh's brain were normal. More importantly, he stressed that Arbaugh's cognitive problems and history of mental illness were best addressed by other physicians; thus, as to those matters, he deferred to the neuropsychologists.

■ Once again, we have repeatedly stated that the credibility of any witness is a matter exclusively within the province of the Commission. *Freeman v. Con-Agra Frozen Foods*, 344 Ark. 296, 40 S.W.3d 760 (2001); *Kuhn v. Majestic Hotel*, 324 Ark. 21, 918 S.W.2d 158 (1996). Because the record contains testimony and

---

[4] As reflected in the record, Dr. Souheaver testified that he thought three of the diagnoses noted in Arbaugh's medical records as of June 2000 (major depression recurrent, mild cognitive disorder (NOS), and bipolar disorder) may be relevant in this case; however, he could not say Arbaugh had more frequent or more severe episodes of depression as a result of the electrical shock on June 2.

reports from medical experts that Arbaugh did not sustain an organic-brain injury during the June 2 incident, and that his organic-brain problems were not causally related to the incident, we are not convinced that fair-minded persons could not have reached the conclusions arrived at by the Commission. Accordingly, we must affirm the Commission's decision as it is supported by substantial evidence.

Affirmed.